UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

LLG S.A., a British Virgin Islands Company,

      Plaintiff,

vs.

MILTON HARBOR VIEW ENTERPRISES,
LLC, a Florida limited liability company; and
ROBERT L. ALEXANDER,

      Defendants.

_____/

## COMPLAINT FOR DAMAGES

      The Plaintiff, LLG S.A. (hereinafter "Plaintiff") files this its Complaint for Damages Against the Defendants, MILTON HARBOR VIEW ENTERPRISES, LLC and ROBERT L. ALEXANDER (hereinafter collectively referred to as "Defendants") as follows:

## DESCRIPTION OF THE LAWSUIT

1. This is a lawsuit for rescission of contract or in the alternative monetary damages arising from the sale of Sailing Vessel FAULT TOLERANT, hull identification number HYMG6001L214, U.S. Coast Guard Official # 1253555,  (hereinafter "S/V FAULT TOLERANT" or "Subject Vessel") by the Defendants to the Plaintiff at a purchase price of Two-Million One Hundred Thousand Dollars ($2,100,000.00).

2. This Gunboat 60 sailing yacht is a high tech, carbon fiber luxury racing and cruising sailboat that is equipped with a hybrid drive system, solar panels, multiple lithium ion battery banks, computers which control most everything including the hydraulically operated sails and litany of other high tech features.

3. The Gunboat is essentially a floating computer that is designed to race or cruise though the open ocean.  As will be set forth in this lawsuit, the Defendants engaged in a pattern of fraud and deception to cover up the fact that the Subject Vessel had been struck and damaged by lightning as least twice in the two (2) years prior to the October 25, 2019 closing.

4. This conduct was intentional and calculated to dump this damaged vessel on an unsuspecting purchaser. The Defendants' fraud was a success.

5. Post-closing the vessel could not move under its own power for a less than two mile voyage to an adjacent marina. Within hours of the Plaintiff closing this yacht sale transaction, the Gunboat 60 had to be towed into its new marina. Within a week it had to be hauled out of the water, where it remains to this day facing repairs that will take almost a year and hundreds of thousands of dollars to complete.

6. As will be proven in this lawsuit, the Plaintiff is entitled to rescission of contract and money damages or money damages to repair the extensive lightning damage to the Subject Vessel.

## **PARTIES AND THE VPSA**

7. The Plaintiff, LLG S.A. is a BVI Business Company with an address of 3076 Sir Francis Drake's Highway, Road Town, Tortola, British Virgin Islands.   LLG S.A. is a citizen of the Territory of the British Virgin Islands.

8. The first Defendant is MILTON HARBOR VIEW ENTERPRISES, LLC, a Florida Limited Liability Company with an address of 340 Royal Poinciana Way, Suite 317344, Palm Beach, Florida 33480.   The company's sole managing member is the

Second Defendant, ROBERT L. ALEXANDER.   ALEXANDER is a resident and citizen of the State of New York.   The company is a citizen of the State of New York.

9. The second Defendant is ROBERT L. ALEXANDER, a resident of Rye, New York. ALEXANDER is a citizen of the State of New York.

10. ALEXANDER signed the Vessel Purchase and Sale Agreement on behalf of MILTON HARBORVIEW ENTERPRISES, LLC.

11. Mr. Hamnett Hill ("Mr. Hill") is the sole director of the Plaintiff, who executed the Vessel Purchase and sale agreement on its behalf.

12. The fully executed Vessel Purchase and Sale Agreement (hereinafter "VPSA") is attached hereto as Exhibit "A".

## JURISDICTION AND VENUE

13. Subject Matter Jurisdiction lies pursuant to 28 USC §1332, as the parties are citizens of different states and the amount in controversy exceeds the sum of value of $75,000.00 exclusive of interest, attorney fees and costs.

14. Venue is proper in this Court because the parties contractually agreed that:

> "Any proceeding relating to this Agreement will be brought in the courts of the State of Florida in a federal district court of applicable jurisdiction. Each of the parties irrevocably submits to the exclusive jurisdiction of such court, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the proceeding shall be heard and determined only in any such court, and agrees not to bring any proceeding relating to this Agreement in any other court." [Ex. A ¶ 16].

15. This court has personal jurisdiction over MILTON HARBOR VIEW ENTERPRISES, LLC as it is a Florida Limited Liability Corporation that is registered to do business in this State.

16. The court has personal jurisdiction over ALEXANDER as he personally transacts business in this state with regularity, including:

    a. ALEXANDER sold, as part of this transaction, a tender (2014 13'5" Ribcraft FL3054PX) and a trailer for that tender (2015 LORI with plate # 314RUG), which were registered with the State of Florida in the name of Robert L. Alexander;

    b. In May of 2019, ALEXANDER, contracted in his name with Whiticar Boat Works in Stuart, Florida to haul out S/V FAULT TOLERANT and conduct maintenance and repairs to the vessel.   ALEXANDER was billed $20,206.33 by Whiticar Boat Works and paid those sums in the State of Florida.

17. The Defendants further consented to personal jurisdiction in this Court by filing a prior related Complaint for Declaratory Judgment under case number 9:20-cv-80236-JIC that was previously dismissed by the Court at DE 13.

## **GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

18. Defendant ALEXANDER hired as his broker, Spike Abram (hereinafter "Abram") of GL Yachting USA based in Rhode Island.

19. Abram and GL Yachting USA were agents of the Defendants in marketing and selling S/V FAULT TOLERANT.

20. Based on information and belief, GL Yachting USA is the factory authorized broker for GUNBOAT.

21. Abram and GL Yachting USA, marketed S/V FAULT TOLERANT to consumers of yachts such as Mr. Hill.

22. Abram's email account used at all times material is "spike@gunboat.com" giving consumers such as Mr. Hill the impression that Abram has expertise with regard to Gunboats.

23. Based on information and belief, ALEXANDER provided information on the history of S/V FAULT TOLERANT to Abram and GL Yachting for disclosure to potential purchasers.

24. ALEXANDER failed to disclose the Subject Vessel's history of lightning strikes to Abram and GL Yachting.

25. On June 15, 2019, Mr. Hill contacted Abram by email seeking information on Gunboats that were for sale.

26. Abram responded later that day with web links to information concerning S/V FAULT TOLERANT, which was listed for sale at the price of $2.5 million dollars.

27. The web link provided to Mr. Hill for S/V FAULT TOLERANT directed back to the Brokerage section of the Gunboat factory website.

28. The web page for S/V FAULT TOLERANT provided the following description:

   *Fault Tolerant is an exhilarating, high-performance sailing machine with plenty of comfort, space and storage for long-term, live-aboard cruising.*

   *This Gunboat 60 is perfectly appointed and versatile for a range of sailing plans with ample space and quarters to accommodate family, friends and crew. Coastal or long-range cruising, sail in style and get there fast!*

29. The webpage included various sections with information on S/V FAULT TOLERANT including: Specifications, Sail Plan, Equipment, Accommodations, Construction and Rig.   It also contained links to 27 high resolution photographs showing the vessel both on a mooring and underway during sailing races.

30. Also on the webpage provided by Abram, were links to Instagram posts made about S/V FAULT TOLERANT, including a post touting the vessel's success in a Caribbean Regatta.  A screen shot of the webpage is attached hereto as Exhibit "B".

31. Based on information and belief, the Defendants reviewed and approved of this vessel listing webpage before it was transmitted to Mr. Hill.

32. Notably, the webpage does not include a disclosure that S/V FAULT TOLERANT had been struck and damaged by lightning on multiple occasions requiring repairs.

33. On June 17, 2019, Abram provided additional information concerning S/V FAULT TOLERANT via email stating:

*If you look at the list of upgrades that have been completed on FT and Arethusa they are extensive and have allowed the boats to become reliable and meet the original needs of the owners of fast luxury performance sailing.*

*In terms of performance the boats are quick and this can be highlighted by the performance of Flow and Arethusa racing. The 60's have also been extremely successful cruising globally with boats in New Zealand, The Pacific, Europe and the Caribbean.*

*Arethusa and Fault Tolerant have been extremely well looked after and managed and the outlay to get them to where are today is way above the current asking prices.*

*With their current condition and investment I personally do not feel that there is any cloud hanging over these boats, and I would not have been saying that previous to the investment by the current owners. I have every confidence that they will continue to provide enjoyment for their owners, family and friends for many years ahead.*

*I will send an upgrades list in the coming days.*

*Let me know if any questions and happy to chat through the attached info.*

*Spike*

34. Abram's email does not include a disclosure that S/V FAULT TOLERANT had been struck and damaged by lightning on multiple occasions requiring repairs.

35. On June 18, 2019, Abram sent Mr. Hill another email with information on scheduling a visit to look at S/V FAULT TOLERANT as well as an extensive list of "Fault Tolerant upgrades since 2016". The text of the email is as follows:

*Hi Hamnett,*

*Below is the list of Fault Tolerant upgrades since 2016*

*Availability dates to view the boat:*
*Available in Rye now through July 3rd.*
*Available in Rye July 9th-10th*
*Available in Newport July 23rd- August 1st.*
*Available in Rye August 13th-27th.*

*Fall 2018*

  * *Replaced B&G H3000 with H5000 performance CPU*
  * *Three new Zeus 3 touch 12"*
  * *Two new Zeus 3 touch 9", one in crew one in master cabin.*
  * *Two new H5000 autopilot computers.*
  * *Two new H5000 autopilot controls, added one in forward working cockpit.*
  * *Two new 20/20HV H5000 Displays*
  * *Two new H5000 Graphic Displays*
  * *Five new Triton2 Digital Displays*

*Winter 2018*

  * *New propulsion system, Titanium Sail Drive*
  * *Removed retractable skegs which were a lot of maintenance and weight*
  * *New electric motors.  1/3 the size, 1/3 the weight.*
  * *Harken 990 Electric Winches*
  * *New dinghy davit winch, 1/2 weight of the original lewmar and  more reliable.*
  * *Remote for dinghy davit winch*
  * *Installed 4' Transom Extensions*
  * *Installed Antal  powered traveler control.*
  * *Installed hydraulic powered mast rotation.*
  * *Added wireless remote control for main sheet, traveler and mast rotation so when racing main trimer can walk around and trim the main.*
  * *New leather cushions and upholstery inside and outside*
  * *New mattresses*
  * *New HV battery pack*
  * *New tramp netting and lashings*
  * *New wiring in mast.*

* *New EC-6 cap shrouds*
* *New EC-6 wisker stays*
* *New Centerboards*
* *Reworked forward bow areas which was dead space now have storage there.*
* *New Czone control screen*
* *Hull Paint Job*
* *Cabin sole protection roll out mats for entire boat.*
* *Weight reduction all around, 2 MT*

*Spring 2016*

* *EC-6 forestay*
* *New steering system with rudders tied together*
* *Moved autopilots rams out of rudder area which was very wet*
* *Titanium lower rudder bearings*

*The only upgrade consideration to make for cruising/racing would be sails.*
*A lot of people love the North product but on Tribe we had Doyle and I think the service and cost (approx. 35) are better and the membranes and design on a par.*

*Regards*
*Spike*

36. Defendant ALEXANDER's upgrade list does not include a disclosure that some of the listed "upgrades", based on information and belief, were actually repairs of damage to the vessel sustained in multiple lightning strike which occurred prior to the execution of the VPSA.

37. Based on information and belief, the electronics replacement in the Fall of 2018 was required as a direct consequence of a lightning strike to the Subject Vessel.

38. At the time Mr. Hill was also considering another Gunboat S/V Arethusa. As part of the disclosures concerning that vessel, Abram shared the vessel's damage history, indicating that Abram and the owner of S/V Arethusa were aware that incidents of damage and repair must be disclosed to potential purchasers. Abrams email dated June 25, 2019, stated as follows with regard to S/V Arethusa's damage history:

*DAMAGE HISTORY*

   *  *hit the port false bow at Race Week in Newport July of 2016 - repaired by Stu Wyle, no structural damage.*

   *  *Damage recorded*

39. Abram communicated with Mr. Hill by email on June 26, 2019 toward scheduling a viewing of both S/V Arethusa and S/V FAULT TOLERANT.   According to Abram, S/V Arethusa was based in Newport Rhode Island and was available for viewing and test sailing.   S/V FAULT TOLERANT was based in Rye, New York, however *"the owner is only allowing viewing"* not a test sail.

40. As is demonstrated by Abram's email, ALEXANDER early in the transaction limited Mr. Hill's access and ability to test sail the vessel, based on information and belief to hide the fact that S/V FAULT TOLERANT had been damaged by multiple lightning strikes and was unseaworthy or was otherwise limited in her ability to operate under power.

41. Based on information and belief the Defendants were aware of Abram's disclosures to Mr. Hill made on their behalf and did not contact Mr. Hill during this period to make a disclosure of the lightning strikes that had damaged the S/V FAULT TOLERANT.

42. The emails from Abram to Mr. Hill continued during June and July of 2019, Abram shared information from the Defendants concerning the annual cost to operate S/V FAULT TOLERANT, technical details which pertain to racing the vessel and other information not known to the general public.

43. In a June 17, 2019 email Mr. Abram shared the 2018 actual running cost USD for S/V Fault Tolerant, stating *"I asked the owner of FT and he provided the following numbers:"*.

44. The same June 17, 2019 email from Mr. Abram also contained an 18 page PDF titled "Gunboat 60 Steering Refit" describing an extensive redesign and refit of S/V FAULT TOLERANT's steering system, complete with photographs and details descriptions of every aspect of the steering refit.

45. Despite the more and more detailed information provided by the Defendants through Abram, no disclosure was made concerning the Subject Vessel's damage history and the multiple instances where it was struck by and damaged by lightning.

46. On July 23, 2019, Mr. Hill traveled to Newport, Rhode Island to view S/V FAULT TOLERANT.   Abram could not attend the meeting, but sent a member of his team. In an email on July 22, 2019, Abram shared that "The owner of FT Rob and crew Simon and Hadley will be onboard."   "Rob" referenced in the email was the Defendant, ROBERT ALEXANDER.

47. During the viewing of S/V FAULT TOLERANT, Defendant ALEXANDER shared details concerning the vessel and its history, but failed to make any disclosure of the damage caused by the multiple lightning strikes that damaged the vessel during his period of ownership.

48. On July 23, 2019, Defendant ROBERT ALEXANDER allowed a viewing only of S/V FAULT TOLERANT.   Defendant ROBERT ALEXANDER refused to allow even a brief cruise or test sail until an offer had been made on the vessel.

49. Based on information and belief, this restriction with regard to sailing the vessel, was put in place to mask the fact that multiple lightning strikes had damaged the vessel and its vessel's hybrid drive system.

50. After the visit to S/V FAULT TOLERANT on July 23, 2019 Abram's associate that attending with Mr. Hill, sent Mr. Hill various racing videos of other Gunboats calculated to have Mr. Hill equate the performance of those vessels with S/V FAULT TOLERANT.

51. In an email dated, July 31, 2019, Simon Wilson, the Captain of S/V FAULT TOLERANT provided his thoughts on future upgrades to the vessel. The email states as follows:

*Good Morning Hamnett,*

*I apologise for the delay in getting this list across, I spoke with Rob before sending the below to make sure I am keeping everybody happy in this situation.*

*Rob added his thoughts in orange below and I'm looking forward to chatting about these soon.*

*I see list one as items to be like in led at in the next yard period and list 2 as Future development.*

*I have to head ashoreto get a few contractors at 0800 as we are on a mooring, and then I am available all morning for a chat if that works?*

*I look forward to hearing from you soon.*

52. The information that Captain Wilson provided to Mr. Hill had to be cleared with Defendant ALEXANDER before it could be shared. Based on information and belief, Captain Wilson was aware of the lightning strikes to the Subject Vessel, but had been ordered by Defendant ALEXANDER not to disclose them to Mr. Hill.

53. Later in the email, Defendant ALEXANDER provided his personal comments on the upgrade topics such as sails, equipment on the mast, electronics, refrigeration and the question of upgrading the Subject Vessel's solar charging systems.   Despite discussing the vessel's systems in detail, Defendant ALEXANDER made no disclosure concerning the Subject Vessel's damage history and the multiple instances where it was struck by and damaged by lightning.

54. Abram continued to provide information to Mr. Hill in response to his questions as he became more interested in purchasing S/V FAULT TOLERANT.   In an email dated August 11, 2019, Abram provided answers to questions posed by Mr. Hill, directly from Defendant ROBERT ALEXANDER as follows:

    *Q. How long has the current owner had the boat?  Did he have a survey done when he bought it? If yes - could you get it for me?*

    *Rob -  I have owned the boat since new and took delivery for sea trials in China December of 2013.  Boat was shipped to Savanah and taken off ship in March of 2014.  Sailed to Gunboat yard in Wanchese and had some post delivery work done there.Sailed boat to New England May of 2014. Fall and winter of 2015 boat was in Wanchese and then sailed to the Bahamas in March of 2015.Been sailing ever since.*

55. Defendant ALEXANDER responded to Mr. Hill's questions concerning the history of the boat, again withholding the critical information that the boat had been damaged by multiple lightning strikes during his ownership.

56. Also of note, Defendant ALEXANDER ignored Mr. Hill's question concerning whether he had a survey of the vessel.   Based on information and belief Defendant ALEXANDER was in possession of at least one survey of the vessel prior to the VPSA being signed and filed to disclose them to Mr. Hill.

57. Based on information and belief, this failure to disclose the survey was to keep secret the damage caused to S/V FAULT TOLERANT by lightning strikes.

58. The information provided by Defendant ALEXANDER in response to Mr. Hill's questions, increased Mr. Hill's confidence that the S/V FAULT TOLERANT was in excellent condition and well maintained by its owner.    Mr. Hill was unaware however that this was all part of Defendant ALEXANDER's fraud and calculated plan to hide the damage caused to the vessel by multiple lightning strikes.

59. Over the next two (2) weeks Mr. Hill continued to request information from Abram on potential crew for the vessel, insurance and other issues pertinent to ownership.

60. Based on information and belief, S/V FAULT TOLERANT was struck again and damaged by lightning on August 19 or 20, 2019.

61. Defendant ALEXANDER was personally aware of this lightning strike and failed to disclose it in any manner to Mr. Hill, despite a legal obligation to disclose facts materially affecting the value and seaworthiness of the vessel.

62. Defendant ALEXANDER hurriedly arranged for contractors to conduct partial repairs to the damage caused by the August 2019 lightning strike.

63. Defendant ALEXANDER made a claim on the S/V FAULT TOLERANT's marine insurance policy with Chubb Insurance for the August 2019 lightning strike.

64. Defendant ALEXANDER was paid by Chubb Insurance for damage caused to the Subject Vessel in the August 2019 lightning strike.   Defendant ALEXANDER received these funds from Chubb Insurance, but did not use all of the funds to properly repair the Subject Vessel.

65. On August 26, 2020, Mr. Hill made a written offer utilizing the VPSA (attached as Exhibit "A") to purchase S/Y FAULT TOLERANT for Two Million One Hundred Thousand Dollars ($2,100,00.00).

66. The offer included a brief letter from Mr. Hill to Defendant ALEXANDER, which stated in pertinent part as follows:

*Dear Rob,*

*I trust this email finds you well.   I am pleased to be able to extend this offer to purchase Fault Tolerant. It is obvious how well used and cared for she has been under your watch, and it's easy to envision the role she could play in our lives as we get back into sailing as a family.*

*Having bought and sold a few boats and other things, I am not a big fan of investing a lot of time in back and forth haggling, nor the obligatory post survey re-negotiation and re-trade. I am interested in quickly seeing if there is an opportunity for us to come to terms and then moving on, either way.*

*It is in that spirit that I enclose this non-contingent offer, secured by a $1mm non-refundable deposit. I completely understand you may decide to wait for a different offer, but should you accept our offer, a quick guaranteed close and a new home for FT this fall is assured. In either case I wish you the best.*

*Thank you very much for your time and consideration,*

*Hamnett*

67. As was stated in this letter, Mr. Hill's decision to make a non-contingent offer to purchase S/V FAULT TOLERANT, was in large part based on information provided by Defendant ALEXANDER regarding the historical use and care of S/V FAULT TOLERANT.

68. Defendant ALEXANDER targeted his disclosures to entice Mr. Hill to purchase S/V FAULT TOLERANT, while defrauding him by failing to disclose the lightning strikes and damage that had been sustained by the vessel.

69. Due to Defendant ALEXANDER's fraudulent conduct and intentional non-disclosure of the Subject Vessel's history of sustaining lightning strike damage, Mr. Hill decided to purchase this vessel without knowledge of the extensive damage it has sustained in multiple lightning strikes.

70. The offer was accepted by the Defendants on August 28, 2019.

71. Based on information and belief, Defendant ALEXANDER had repairers onboard the Subject Vessel addressing the lightning strike damage both before and after the acceptance of the Mr. Hill's offer and failed to disclose the strike, or the fact that the vessel was being repaired to Mr. Hill.

72. Defendant ALEXANDER's fraud was a success as it had yielded a non-contingent purchase offer on S/V FAULT TOLERANT.

73. Had a full and complete disclosure been made by Defendant ALEXANDER concerning the Subject Vessel's lightning strike history, Mr. Hill would not have made this offer to purchase S/V FAULT TOLERANT or would have made a purchase offer that reflected the actual condition of the Subject Vessel.

74. At no point prior to the offer or acceptance did Defendant ROBERT ALEXANDER disclose the multiple lightning strikes that had damaged S/V FAULT TOLERANT.

75. The Defendants knew that prior lightning strikes to the Subject Vessel and repairs conducted were material facts affecting the value of the S/V FAULT TOLERANT, which were not readily observable and were not known to Mr. Hill and the Plaintiff.

76. The Defendants had a legal duty to disclose these material facts to Mr. Hill and the Plaintiff.

77. Mr. Hill (and the Plaintiff) entered into the VPSA as a result of the fraudulent inducements, assurances and calculated omissions made by Defendant ALEXANDER and MILTON HARBOR VIEW ENTERPRISES, LLC.

78. The fraudulent misrepresentations and omissions by Defendant ALEXANDER and MILTON HARBOR VIEW ENTERPRISES, LLC vitiates every part of the VPSA including any "as is" clause or other contractual disclaimers included to protect the these Defendants.

79. In paragraph 10 of the VPSA the Defendants represented to the Plaintiff as follows:

*Seller represents and warrants to Buyer, during Seller's ownership of the Vessel, that the Vessel*

    *i.      has not run aground;*

    *ii.     has not been involved in a collision;*

    *iii.    has not been involved in an allision;*

    *iv.    has not suffered fire damage, including electrical fire;*

    *v.     has not suffered smoke damage;*

    *vi.    has not suffered any damage to the hull, keel or mast(s) beyond normal wear and tear; or*

    *vii.   has not encountered any structural or latent defects.*

80. In addition to fraudulently inducing Mr. Hill to contract through the VPSA, Plaintiff contends that Defendants breached paragraphs iv, v, vi (as to the mast and hull) and vii, by failing to make any disclosure concerning the damage caused to the Subject Vessel by the multiple lightning strikes, which occurred prior to the VPSA being executed by the Parties.

81. After accepting the VPSA, Defendant ALEXANDER continued to share information concerning the Subject Vessel, but repeatedly failed to disclose the Subject Vessel's history of sustaining lightning strike damage.

82. In an email dated August 26, 2019, Defendant ALEXANDER shared the ownership history of the vessel as follows (with Mr. Hill reading in copy):

*Steven and Peter,*

*First thanks for copying everybody.  I like that and we can all help bring this purchase and sale forward, both myself, Hamnett, Spike and council.*

*Attached is a copy of the current USCG Documentation Certificate.  Also a copy of the 7501. Duty has been paid.  I am also attaching an abstract of title from USCG.  Let me know if any other documents would be helpful during this phase of getting the contract sorted.*

*Current ownership is Milton Harbor View Enterprises, LLC a FL corporation where I am the only member.*

*In case it maters a brief history of the ownership of the boat Fault Tolerant. I have always been the owner directly and indirectly but:*

*When the boat was first purchased it was flagged offshore and owned by an offshore company FT Harbour View LTD.  I transferred ownership to myself for ease of cruising in the USA.  In the fall of 2018 I transfer ownership to Milton Harbor View Enterprises, LLC a FL company for liability reasons.*

83. Defendant ALEXANDER's August 26, 2019, email failed to disclose the Subject Vessel's history of sustaining lightning strike damage despite providing other details of the vessel's history.

84. On September 5, 2019, Mr. Hill had a marine survey conducted on S/Y FAULT TOLERANT to determine its condition for purposes on insurance.

85. Mr. Hill did not undertake to have traditional pre-purchase survey as the Defendants fraudulently induced him to make a non-contingent purchase offer that waived his right to conduct a pre-purchase survey.

86. The surveyor engaged was Patrick Goodrow of High Tech Marine Surveys.

87. Mr. Goodrow was recommended by Joseph Pelletier, a former captain of S/Y FAULT TOLERANT, who had been advanced by Mr. Abram, with Defendant ALEXANDER's permission, to assist Mr. Hill with the purchase of the Subject Vessel.

88. In advance of the survey, Defendant ALEXANDER acted to restrict the Plaintiff's ability to sea-trial the vessel away from its mooring ball.   On September 2, 2019, Defendant ROBERT ALEXANDER stated as follows:

> *Joe sounds good.   Not sure that I understand your statement   "he does not require an extended "performance judgment" sea trial for his report" mean.   There is no plan to leave the mooring for the survey especially if the weather is as forecast.   My understanding is this would all take place at the mooring.  Please confirm.*
>
> *Robert Alexander*
> *robert.leon.alexander@gmail.com*

89. Defendant ALEXANDER was present for the survey and did ultimately agree to a brief sea-trial.

90. During the survey, Defendant ALEXANDER failed to disclose that any lightning strike, including the August 2019 strike had damaged the Subject Vessel.

91. During the survey, Defendant ALEXANDER failed to disclose that repairs had recently been conducted aboard the Subject Vessel as a result of the August 2019 lighting strike.

92. Defendant ALEXANDER prepared the boat for sea-trial and based on information and belief again configured the vessel's hybrid drive system to be powered directly from the vessel's diesel generators.  This was done to mask the fact that multiple lightning strikes had damaged the vessel's hybrid drive system.

93. This fraudulent conduct by Defendant ALEXANDER was calculated to continue to hide the substantial lightning damage to the Subject Vessel and ensure that the sale proceeded.

94. After the survey and sea trial on September 5, 2019, Defendant ALEXANDER sent the following email to Mr. Hill:

*Hamnett,*

*Pleasure to have you and Sian aboard today.   Let me know if any questions pop up regarding FT, I will do my best to answer.*

*Joe is a good person and very knowledgeable concerning FT and would be a good helping hand during the transition.*

*Rob*

95. Again, Defendant ALEXANDER failed to make any disclosure concerning the damage caused to the Subject Vessel by the multiple lightning strikes.

96. On September 26, 2019, Defendant ALEXANDER send the following email to Mr. Hill concerning the vessel's tender and its repair history:

*Hamnett,*

*I understand that you are looking for info on the Gunboat tender that comes with the boat. That was the tender that was on the davits during the sail three weeks ago.  Besides normal maintenance a new under deck fuel tank was installed October 2018.*

*Here are the specifications for the tender.*
*GUNBOAT 4.20 CARBON RIB TENDER*
*Carbon foam composite hull, hypalon tube*
*Yamaha EFI 4-stroke 70hp engine, electric start with battery*
*(4) Lifting Points*
*(8) gallon gas tank fit below floor*
*Fuel Gauge*
*(6) position electrical switch panel*
*Battery Switch*
*Lopo LED Nav lights*
*Bilge pump*
*Charcoal hypalon tubes*

*Storage compartment in bow*
*Jockey Center Seat with storage*
*Rear Bench Seat with Storage*
*TurboSwing Ski Tow Bar*
*Smart Auto Trim Tabs*
*Anchor*

*Spike told me you have hired Tavish.  During my crew search I spoke with many potentials and came away with a good feeling about Tavish and Ineke, glad you feel the same way. Even better my insurance company was satisfied with their credentials.*

*Between Tavish and Joe it looks like you have a capable crew on the ground to take over Fault Tolerant, but let me know if there is anything I can do to help them during the transition. I know right now we are setting up dates for their visit to the boat.*

*Libby and I am thrilled knowing FT is going to a good home and look forward to seeing her sailing in the years to come.*

*Rob*

97. Again, Defendant ALEXANDER failed to make any disclosure concerning the damage caused to the Subject Vessel by the multiple lightning strikes.

98. In preparation for the purchase of the Subject Vessel, Mr. Hill, on behalf of the Plaintiff hired Captain Tavish McKenzie.    McKenzie had not previously worked aboard a Gunboat 60, nor had he ever been a Captain of S/V FAULT TOLERANT.

99. As is typical, the new captain sought an orientation aboard the Subject Vessel in advance of the closing, so that he could make preparations to take over command.

100.   In this context, Defendant ALEXANDER again acted to restrict the Plaintiff's access to the Subject Vessel, to preserve the fraud and ensure the closing of the transaction.

101.   In his October 1, 2019 email to Mr. Hill, Defendant ALEXANDER imposed these restrictions as follows:

*Hamnett,*

*Sounds like a good agenda. My only possible concern I have is with the first item. "Joe is going to give HL a walk through of the boat and systems"*

*If it is just a walkthrough fine, but if the agenda is to run through each system and instruct in its use then I think that is better left for after the closing.*

*For example I will just pick the watermakers. If Joe wants to point out there are two watermakers and they are located here, and the switch panels are located there, fine. But if they want to get into how they are operated and what the different valves do then I think that is beyond the scope of the day and should be left for after closing.*

*Other than that concern I think we are fine and they should have plenty of time to go through the boat, gear on the boat and on land.*

*Looking forward to their visit.*

102.   Defendant ALEXANDER would not permit the Plaintiff's Captain to operate vessel's systems prior to closing.   A Seller without a hidden agenda would not impose such a restriction.  This was additional conduct in support of the fraud to prevent Mr. Hill and the Plaintiff from discovering that lightning strikes had damaged the Subject Vessel.

103.   On October 8, 2019, Captain McKenzie was aboard S/V FAULT TOLERANT for his initial orientation.   Defendant ALEXANDER was aboard for this orientation, shadowed Captain McKenzie aboard the vessel and did not permit him to test or otherwise operate vessel systems.  This was additional conduct in support of the fraud to prevent Mr. Hill and the Plaintiff from discovering that lightning strikes had damaged the Subject Vessel.

104.   During the orientation, Captain McKenzie noted two areas of damage at the base of the Subject Vessel's mast that had been covered up by black duct tape.

105.   These areas had never been pointed out by Defendant ALEXANDER during Mr. Hill's first visit to the vessel nor during the survey.

106.   In Defendants' prior related Complaint for Declaratory Judgment under case number 9:20-cv-80236-JIC, Defendant ALEXANDER's recollection of Captain McKenzie's discovery of this mast damage was alleged as follows:

*29.   Robert Alexander was present aboard during this inspection and told both Captains, Pelletier and McKenzie, about the lightning strike that hit the vessel prior to the execution of the Vessel Purchase and Sale Agreement.   At this time, Mr. Alexander showed Pelletier and McKenzie the wind instrument wand or masthead wind sensor, which was believed to be where the lightning strike hit Fault Tolerant. At this time, there was also a discussion about the two areas on the deck near the mast thought to be related to the strike.* [DE 1, ¶ 29].

107.   Although Plaintiff disputes Defendant ALEXANDER's recollection of what occurred on October 8, 2020, if this allegation is taken as true, it is an admission against interest, that Defendant ALEXANDER had knowledge of at least one lightning strike, which caused damage to S/V FAULT TOLERANT and failed to disclose it to Mr. Hill and the Plaintiff prior to execution of the VPSA.

108.   Defendant ALEXANDER further failed to disclose the lightning after the VPSA was signed and only mentioned it when the vessel's new Captain pointed to damage on the mast, in Defendant ALEXANDER's presence.

109.   Based on information and belief, Plaintiff contends that Defendant ALEXANDER was aware of not only one, but multiple lightning strikes to S/V FAULT TOLERANT and failed to make any disclosure of these strikes or the extensive damage caused to the Subject Vessel in the context of offering the vessel for sale, nor in the multiple instances where he shared favorable information with Mr. Hill to fraudulently induce him to purchase the Subject Vessel.

110.   To increase pressure on the Plaintiff to close the transaction contemplated by the VPSA, after the insufficient and incomplete disclosure concerning a lightning strike,

Defendant ALEXANDER threatened to sue and attempt to collect the Plaintiff's $1 million dollar deposit, if Plaintiff did not immediately close the transaction.

111.   This left Plaintiff with insufficient time to properly investigate the damage caused to the Subject Vessel by the allegedly disclosed lightning strike and other strikes that occurred but were not disclosed by Defendant ALEXANDER in advance of the execution of the VPSA or the closing.

112.   Faced with the prospect of losing a $1 million deposit, Plaintiff closed the transaction on October 25, 2019.

113.   Notably, Defendant ALEXANDER refused to bring the S/V FAULT TOLERANT into the dock at the Gunboat brokerage offices for the closing.

114.   Defendant ALEXANDER moved the boat from Rye, New York to Newport Rhode Island alone or with unknown temporary crew, tied it to a mooring ball in Newport Harbor and refused to allow access to the vessel until the closing funds had been received.

115.   Post-closing the vessel could not move under its own power for a less than two mile voyage to the Goat Island Marina.

116.   Within hours of the Plaintiff closing this yacht sale transaction, the Gunboat 60 had to be towed into its new marina.

117.   Within a week it had to be hauled out of the water, where it remains to this day facing repairs that will take almost a year and hundreds of thousands of dollars to complete.

118.   Post-closing, the Plaintiff has conducted extensive investigation aboard the vessel and has determined that it was systemically damaged by multiple lightning strikes effecting the following systems:

    a.  Propulsion

    b.  House electrical systems, (including wiring throughout the vessel)

    c.  DC electrical systems

    d.  C-Zone control systems

    e.  Sensors and instruments

    f.  Mast and associated rigging

119.   Cost of repair to return the Subject Vessel to pre-strike condition is estimated to be between $750,000.00 and $850,000.00 inclusive of yard fees, storage, crew salary and crew housing expenses.

120.   Plaintiff has also sustained consequential and incidental damages including replacement vessel charter fees, travel costs associated with repairs, survey fees, testing fees, expert fees, attorney's fees, costs and diminution in value of the Subject Vessel.

121.   Prior to filing this lawsuit, Plaintiff made a settlement demand to the Defendants and attempted on multiple occasions to initiate negotiations toward reaching a financial settlement to avoid litigation.  This included sharing anticipated costs of repair for the lightning related damage.

122.   Defendants responded to the demand by hastily filing a Declaratory Judgment Action that was ultimately dismissed by the Court.   Defendants further refused to

engage in any productive settlement negotiations and did not make any offer of money to resolve this matter short of litigation.

123.   This conduct by the Defendants, constitutes pre-suit bad faith and required the Plaintiff to file suit to obtain relief.   Pre-suit bad faith entitles the Plaintiff to an award of attorney's fees against the Defendants.

124.   Proof of fraud entitles the Plaintiff to an award of compensatory and punitive damages.

125.   In the alternative, the VPSA contains a prevailing party attorney's fee and cost provision.

126.   All conditions precedent to filing this lawsuit have occurred or have been waived.

## COUNT I – FRAUDULENT INDUCEMENT/MATERIAL OMISSION BY DEFENDANT ROBERT ALEXANDER

127.   The Plaintiff re-alleges and re-avers each and every allegation contained within paragraphs 1 – 126 as if fully set forth herein.

128.   Defendant ALEXANDER, knew prior to Mr. Hill's offer to purchase, on behalf of the Plaintiff, that the vessel was not seaworthy and that the vessel had been damaged by multiple lighting strikes, including but not limited to the August 2019 strike.

129.   Despite said knowledge, Defendant ALEXANDER, knowingly made the following misrepresentations and omission of material fact with the intent of inducing Mr. Hill and the Plaintiff into purchasing S/V FAULT TOLERANT, including but not limited to:

a.   Advertising that *"Fault Tolerant is an exhilarating, high-performance sailing machine with plenty of comfort, space and storage for long-term, live-aboard*

*cruising. This Gunboat 60 is perfectly appointed and versatile for a range of sailing plans with ample space and quarters to accommodate family, friends and crew. Coastal or long-range cruising, sail in style and get there fast!"* with knowledge that this statement was false, due to the damage sustained by the Subject Vessel in multiple lightning strikes;

b. Disclosing an upgrade list, set forth in paragraph 35 above, that included work done to repair lightning strike damage, while failing to disclose this material fact;

c. Failing to disclose that multiple lightning strikes had caused damage to the Subject Vessel and its systems, which rendered the boat unseaworthy and inoperational;

d. Failure to disclose that a lightning strike occurred on August 19 or August 20, 2019 that caused damage to the Subject Vessel and its systems, which rendered the boat unseaworthy and inoperational;

e. Failure to disclose that repairs were being conducted to S/V FAULT TOLERANT in August and September of 2019, to address damage caused in the August 2019 lightning strike, both in the period before the VPSA executed and afterward;

f. Failure to disclose that S/V FAULT TOLERANT was barely operational in terms of its ability to navigate at the time of the closing;

g. Failure to disclose that S/V FAULT TOLERANT had unrepaired damage from multiple lightning strikes at the time of the closing;

h.  Failure to disclose that S/V FAULT TOLERANT had multiple inoperable systems at the time of closing;

i.  Failure to disclose multiple hidden areas of damage and defects within the S/V FAULT TOLERANT that could not be discovered by Mr. Hill or the Plaintiff without substantial disassembly of the vessel and/or through the use of inspection methods that are customary with regard to the purchase of a recreational yacht and;

j.  Other misrepresentations and material omissions that will be determined, when the Plaintiff has the ability to conduct discovery and compel witnesses and documents from other parties.

130.  While omitting these material details, Defendant ALEXANDER made other disclosures concerning the Subject Vessel, its condition and its history, specifically those disclosures listed in paragraphs 28, 29, 30, 33, 35, 44, 47, 51, 53, 54, 55, 80, 82, 94, and 96, among others.

131.  To the extent that Defendant ALEXANDER undertook to disclose any information concerning the Subject Vessel to Mr. Hill and the Plaintiff, he was required to make a full and truthful disclosure, including the material facts listed in paragraph 130 above, which negatively impacted the vessel's value.

132.  Defendant ALEXANDER had actual knowledge of the lightning damage to S/V FAULT TOLERANT.    His knowledge was superior to that of Mr. Hill or the Plaintiff. Further, Mr. Hill and the Plaintiff did not have an equal opportunity to become apprised of these material facts.

133.    Defendant ALEXANDER additionally engaged in a pattern of conduct to keep the lightning strikes and resulting damage, as well as the true condition of the Subject Vessel secret from Mr. Hill and the Plaintiff to prevent them from making further independent inquiry regarding the vessel.   These acts by Defendant ALEXANDER are set forth in paragraphs 48, 62, 71, 88, 92, 100, 101, 102, 103, 113 and 114.

134.    Defendant ALEXANDER knew the above referenced misrepresentations were false and he was intentionally omitting material facts for the purpose of inducing Mr. Hill and the Plaintiff to purchase S/V FAULT TOLERANT.

135.    Mr. Hill and the Plaintiff relied on the above referenced misrepresentations and the incomplete and untruthful information provided by Defendant ALEXANDER to his/its own detriment and purchased the Subject Vessel, which was damaged by multiple lightning strikes, was unseaworthy at the time of purchase and requires extensive repairs.

136.    As a result of Defendant ALEXANDER's misrepresentations and omissions, Plaintiff has suffered damages including, but not limited to the cost of the Subject Vessel ($2,100,000.00), dockage, yard fees, costs of repair, housing for crew, additional crew for repairs, upgrades made to the vessel, fees and costs of surveyors and technical experts, attorney's fees and costs, cost of chartering a replacement vessel and any other damages recoverable by law, including punitive damages on proof of fraud or fraudulent omission.

137.    As he committed fraud and fraud by omission, Defendant ALEXANDER is exposed personally to the Plaintiff's claims and cannot claim the protection of MILTON HARBOR VIEW ENTERPRISES, LLC.   The LLC was used to perpetuate a

fraud against Mr. Hill and the Plaintiff, and otherwise disregarded the corporate form in a manner sufficient to pierce the corporate veil.

138.   As Mr. Hill and the Plaintiff were fraudulently induced to purchase the Subject Vessel, the Defendants cannot protect themselves with the various contractual disclaimers contained within the VPSA as these are vitiated by fraud.

WHEREFORE, Plaintiff LLG S.A., respectfully requests that this Honorable Court enter an award in its favor and against Defendant ROBERT L. ALEXANDER, which the Court deems reasonable under the circumstances, including, but not limited to:

a. All damages suffered by Plaintiff;

b. Punitive damages for fraud and fraudulent omission;

c. Reasonable attorney's fees;

d. Costs;

e. Pre-judgment interest;

f. Cost of charter of a replacement vessel

g. Damages for diminution in value;

h. Such other relief as this Court may deem just and proper.

## COUNT II – FRAUDULENT INDUCEMENT/MATERIAL OMISSION BY DEFENDANT MILTON HARBOR VIEW ENTERPRISES, LLC

139.   The Plaintiff re-alleges and re-avers each and every allegation contained within paragraphs 1 – 126 as if fully set forth herein.

140.   Defendant ALEXANDER is the managing member of MILTON HARBOR VIEW ENTERPRISES, LLC.

141.   Defendant ALEXANDER was the only person acting on behalf on behalf of MILTON HARBOR VIEW ENTERPRISES, LLC relative to this transaction.

142.   Defendant MILTON HARBOR VIEW ENTERPRISES, LLC, knew prior to Mr. Hill's offer to purchase, on behalf of the Plaintiff, that the vessel was not seaworthy and that the vessel had been damaged by multiple lighting strikes, including but not limited to the August 2019 strike.

143.   Despite said knowledge, Defendant ALEXANDER, on behalf of MILTON HARBOR VIEW ENTERPRISES, LLC, knowingly made the following misrepresentations and omission of material fact with the intent of inducing Mr. Hill and the Plaintiff into purchasing S/V FAULT TOLERANT, including but not limited to:

   a. Advertising that *"Fault Tolerant is an exhilarating, high-performance sailing machine with plenty of comfort, space and storage for long-term, live-aboard cruising.  This Gunboat 60 is perfectly appointed and versatile for a range of sailing plans with ample space and quarters to accommodate family, friends and crew. Coastal or long-range cruising, sail in style and get there fast!"* with knowledge that this statement was false, due to the damage sustained by the Subject Vessel in multiple lightning strikes;

   b. Disclosing an upgrade list, set forth in paragraph 35 above, that included work done to repair lightning strike damage, while failing to disclose this material fact;

   c. Failing to disclose that multiple lightning strikes had caused damage to the Subject Vessel and its systems, which rendered the boat unseaworthy and inoperational;

d. Failure to disclose that a lightning strike occurred on August 19 or August 20, 2019 that caused damage to the Subject Vessel and its systems, which rendered the boat unseaworthy and inoperational;

e. Failure to disclose that repairs were being conducted to S/V FAULT TOLERANT in August and September of 2019, to address damage caused in the August 2019 lightning strike, in the period before the VPSA executed and afterward;

f. Failure to disclose that S/V FAULT TOLERANT was barely operational in terms of its ability to navigate at the time of the closing;

g. Failure to disclose that S/V FAULT TOLERANT had unrepaired damage from multiple lightning strikes at the time of the closing;

h. Failure to disclose that S/V FAULT TOLERANT had multiple inoperable systems at the time of closing;

i. Failure to disclose multiple hidden areas of damage and defects within the S/V FAULT TOLERANT that could not be discovered by Mr. Hill or the Plaintiff without substantial disassembly of the vessel or through the use of inspection methods that are customary with regard to the purchase of a yacht and;

j. Other misrepresentations and material omissions that will be determined, when the Plaintiff has the ability to conduct discovery and compel witnesses and documents from other parties.

144.   While omitting these material details, Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC made other disclosures concerning

the Subject Vessel, its condition and its history, specifically those disclosures listed in paragraphs 28, 29, 30, 33, 35, 44, 47, 51, 53, 54, 55, 80, 82, 94, and 96, among others.

145.   To the extent that Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, undertook to disclose any information concerning the Subject Vessel to Mr. Hill and the Plaintiff, he was required to make a full and truthful disclosure, including the material facts listed in paragraph 144 above, which negatively impacted the vessel's value.

146.   Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC had actual knowledge of the lightning damage to S/V FAULT TOLERANT.   His knowledge was superior to that of Mr. Hill or the Plaintiff.  Further, Mr. Hill and the Plaintiff did not have an equal opportunity to become apprised of these material facts.

147.   Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, additionally engaged in a pattern of conduct to keep the lightning strikes and resulting damage, as well as the true condition of the Subject Vessel secret from Mr. Hill and the Plaintiff to prevent them from making further independent inquiry regarding the vessel.   These acts by Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, are set forth in paragraphs 48, 62, 71, 88, 92, 100, 101, 102, 103, 113 and 114.

148.   Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, knew the above referenced misrepresentations were false

and that he was intentionally omitting material facts for the purpose of inducing Mr. Hill and the Plaintiff to purchase S/V FAULT TOLERANT.

149.   Mr. Hill and the Plaintiff relied on the above referenced misrepresentations and the incomplete and untruthful information provided by Defendant ALEXANDER, on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, to his/its own detriment and purchased the Subject Vessel, which was damaged by multiple lightning strikes, was unseaworthy at the time of purchase and requires extensive repairs.

150.   As a result of Defendant ALEXANDER's misrepresentations and omissions, made on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, Plaintiff has suffered damages including, but not limited to the cost of the Subject Vessel ($2,100,000.00), dockage, yard fees, costs of repair, housing for crew, additional crew for repairs, upgrades made to the vessel, fees and costs of surveyors and technical experts, attorney's fees and costs, cost of chartering a replacement vessel and any other damages recoverable by law, including punitive damages on proof of fraud or fraudulent omission.

151.   As Mr. Hill and the Plaintiff were fraudulently induced to purchase the Subject Vessel, the Defendants cannot protect themselves with the various contractual disclaimers contained within the VPSA as these are vitiated by fraud.

WHEREFORE, Plaintiff LLG S.A., respectfully requests that this Honorable Court enter an award in its favor and against Defendant on behalf of, MILTON HARBOR VIEW ENTERPRISES, LLC, which the Court deems reasonable under the circumstances, including, but not limited to:

a.   All damages suffered by Plaintiff;

b.  Punitive damages for fraud and fraudulent omission;

c.  Reasonable attorney's fees;

d.  Costs;

e.  Pre-judgment interest;

f.  Such other relief as this Court may deem just and proper.

### COUNT III – RESCISSION BY FRAUD/ MATERIAL OMISSION AGAINST DEFENDANT ROBERT ALEXANDER AND MILTON HARBOR VIEW ENTERPRISES, LLC

152.  The Plaintiff re-alleges and re-avers each and every allegation contained within paragraphs 1 – 126 as if fully set forth herein.

153.  Plaintiff alleges that the VPSA for the vessel was procured by fraud as a result of misrepresentations and omissions of the Defendants, which are set forth in detail above.   These material misrepresentation and omissions include:

a.  Advertising that *"Fault Tolerant is an exhilarating, high-performance sailing machine with plenty of comfort, space and storage for long-term, live-aboard cruising.  This Gunboat 60 is perfectly appointed and versatile for a range of sailing plans with ample space and quarters to accommodate family, friends and crew. Coastal or long-range cruising, sail in style and get there fast!"* with knowledge that this statement was false, due to the damage sustained by the Subject Vessel in multiple lightning strikes;

b.  Disclosing an upgrade list, set forth in paragraph 35 above, that included work done to repair lightning strike damage, while failing to disclose this material fact;

c.  Failing to disclose that multiple lightning strikes had caused damage to the Subject Vessel and its systems, which rendered the boat unseaworthy and inoperational;

d.  Failure to disclose that a lightning strike occurred on August 19 or August 20, 2019 that caused damage to the Subject Vessel and its systems, which rendered the boat unseaworthy and inoperational;

e.  Failure to disclose that repairs were being conducted to S/V FAULT TOLERANT in August and September of 2019, to address damage caused in the August 2019 lightning strike, in the period before the VPSA executed and afterward;

f.  Failure to disclose that S/V FAULT TOLERANT was barely operational in terms of its ability to navigate at the time of the closing;

g.  Failure to disclose that S/V FAULT TOLERANT had unrepaired damage from multiple lightning strikes at the time of the closing;

h.  Failure to disclose that S/V FAULT TOLERANT had multiple inoperable systems at the time of closing;

i.  Failure to disclose multiple hidden areas of damage and defects within the S/V FAULT TOLERANT that could not be discovered by Mr. Hill or the Plaintiff without substantial disassembly of the vessel or through the use of inspection methods that are customary with regard to the purchase of a yacht and;

j.  Other misrepresentations and material omissions that will be determined, when the Plaintiff has the ability to conduct discovery and compel witnesses and documents from other parties.

154.  As a result of the Defendants' intentional misrepresentations and omissions, the Plaintiff was not aware that the Subject Vessel had been damaged by multiple lightning strikes, was not seaworthy and had extensive unrepaired damage at the time of purchase.

155.  If the Plaintiff had known of the lightning strike damage to the Subject Vessel and other issues, it would not have entered into the Purchase and Sale Agreement for the Vessel or would have made an offer that reflected the cost to repair the damage caused by the various lightning strikes.

WHEREFORE, Plaintiff LLG S.A., respectfully requests that this Honorable Court enter an award in its favor and against Defendant ROBERT ALEXANDER and MILTON HARBOR VIEW ENTERPRISES, LLC which the Court deems reasonable under the circumstances, including, but not limited to:

a.  That the VPSA be rescinded and is therefore void *ab initio*, that the monies paid for the purchase of the Subject Vessel be returned with interest;

b.  That the Plaintiff be awarded costs of this action,

c.  Reasonable attorney's fees; and

d.  Pre-judgment interest;

e.  An award of monies spent repairing and upgrading the Subject Vessel after its purchase; and

f.   Such other relief as this Court may deem just and proper.

## COUNT IV – IN THE ALTERNATIVE, BREACH OF VPSA

156.   The Plaintiff re-alleges and re-avers each and every allegation contained within paragraphs 1 – 126 as if fully set forth herein.

157.   Count IV is plead in the alternative as Plaintiff contends that the VPSA was vitiated by fraud and is *void ab initio.*

158.   On August 26, 2020, Mr. Hill made a written offer utilizing the VPSA (attached as Exhibit "A") to purchase S/Y FAULT TOLERANT for Two Million One Hundred Thousand Dollars ($2,100,00.00).

159.   The offer was accepted by the Defendants on August 28, 2019.

160.   The VPSA attached as Exhibit "A" is fully executed and is constitutes a binding contract for sale of the Subject Vessel between these parties.

161.   Paragraph 3 of the VPSA gave the Plaintiff the right to access the vessel to: *(i) plan any post-closing repair/refit work to the Vessel, at (ii) allow Buyer to conduct a non-destructive survey for insurance purposes only.*

162.   The Defendants breached paragraph 3 of the VPSA by restricting Plaintiff's access to the Subject Vessel prior to the closing, in that, Plaintiff's Captain was prohibited by Defendant ALEXANDER from operating certain systems aboard the Subject Vessel in advance of the closing to prevent discovery of the extent of the lightning strike damage to the Subject Vessel.

163.   In paragraph 10 of the VPSA the Defendants represented to the Plaintiff as follows:

*Seller represents and warrants to Buyer, during Seller's ownership of the Vessel, that the Vessel*

     *i.*      *has not run aground;*

     *ii.*     *has not been involved in a collision;*

     *iii.*    *has not been involved in an allision;*

     *iv.*    *has not suffered fire damage, including electrical fire;*

     *v.*      *has not suffered smoke damage;*

     *vi.*    *has not suffered any damage to the hull, keel or mast(s) beyond normal wear and tear; or*

     *vii.*   *has not encountered any structural or latent defects.*

164.  In addition to fraudulently inducing Mr. Hill to contract through the VPSA, Plaintiff contends that Defendants breached paragraphs iv, v, vi (as to the mast and hull) and vii, by failing to make any disclosure concerning the damage caused to the Subject Vessel by the multiple lightning strikes, which occurred prior to the VPSA being executed by the Parties.

165.  Paragraph 15 of the VPSA required: *Seller agrees to provide to Buyer on or before the Closing Date with a history of repairs and/or refit work done to the Vessel plus copies of any previous surveys in the Seller's possession.*

166.  Defendants breached requirements of paragraph 15 of the VPSA by providing an incomplete history of repairs and refit work, which did not disclose repairs required due to prior lightning strikes and the lightning strike which occurred in August of 2019.

167.   Defendants further breached the requirements of paragraph 15 of the VPSA by failing to disclose the survey reports documenting damage caused by prior lighting strikes and the August 2019 lightning strike.

168.   Each of the aforementioned breaches were material and calculated to prevent the Mr. Hill and the Plaintiff from discovering the lighting strike history of the Subject Vessel prior to making and offer to purchase the Subject Vessel and in advance of the closing.

169.   With regard to the breaches of the contractual warranties regarding vessel condition, set forth above these warranties were materially breached as follows:

    a. The Subject Vessel sustained lightning damage to electrical systems including localized heating of components, which created smoke;

    b. The Subject Vessel sustained damage to the mast as a result of the lightning strike, this was beyond normal wear and tear;

    c. The Subject Vessel had latent defects within its electrical system, including damaged electrical components, sensors, wiring runs within enclosed spaces and other latent defects that could not have been discovered by a reasonable pre-sale survey or inspection of the type customarily performed when purchasing recreational yacht.

170.   As a result of Defendants material breaches of Contract, Plaintiff has suffered damages including, but not limited to the cost of the Subject Vessel ($2,100,000.00), dockage, yard fees, costs of repair, housing for crew, additional crew for repairs, upgrades made to the vessel, fees and costs of surveyors and technical experts,

attorney's fees and costs, cost of chartering a replacement vessel and any other damages recoverable by law.

WHEREFORE, Plaintiff LLG S.A., respectfully requests that this Honorable Court enter an award in its favor and against Defendants ROBERT ALEXANDER and MILTON HARBOR VIEW ENTERPRISES, LLC as which the Court deems reasonable under the circumstances, including, but not limited to:

a.  All damages suffered by Plaintiff;

b.  Reasonable attorney's fees;

c.  Costs;

d.  Pre-judgment interest;

e.  Diminution in value;

f.  Such other relief as this Court may deem just and proper.

Respectfully Submitted,

By:     **/s Andrew N. Mescolotto**
ANDREW N. MESCOLOTTO (28141)
anm@fertig.com
FERTIG AND GRAMLING
200 Southeast 13th Street
Fort Lauderdale, FL 33316
PH:    (954) 763-5020
FX:    (954) 763-5412
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on November <u>12</u>, 2020 on all counsel or parties of record on the Service List below.

<u>/s Andrew N. Mescolotto</u>
Andrew N. Mescolotto
Fertig & Gramling

## SERVICE LIST

| | |
|---|---|
| ANDREW N. MESCOLOTTO (28141)<br>anm@fertig.com<br>FERTIG AND GRAMLING<br>200 Southeast 13th Street<br>Fort Lauderdale, FL 33316<br>PH:     (954) 763-5020<br>FX:     (954) 763-5412<br>*Attorneys for Plaintiff*<br>*Via CM/ECF* | |